Good morning, Your Honors. May it please the Court, I am John Johnson, and I am here on behalf of Mr. Lance Rhoades, Plaintiff Appellant. Mr. Rhoades has undergone three surgeries to repair rotator cuff tears of his right shoulder after being injured in a logging accident. The ALJ gave substantial weight to the opinion of Dr. Ciceres, a state agency examining physician who determined that Mr. Rhoades had status post right shoulder surgery with reduced range of motion and had the capacity to lift and carry up to 50 pounds occasionally and 20 pounds frequently. Mr. Rhoades contends that the ALJ erred by giving substantial weight to the opinion of Dr. Ciceres because Dr. Ciceres says that the only records he had before him were from Mercy Medical Center in Reading, which contained only records with regards to rotator cuff tear surgery and arthroplasty of his left shoulder, whereas the laboratory test results, particularly the MRIs in 2008, 2009, and 2014 showed that he continued to have rotator cuff tears of his right shoulder. And clinical findings also revealed that he had half the grip strength in his right hand as well as atrophy of his deltoid muscles. Mr. Rhoades contends that substantial evidence does not support the judge's findings that he made good recovery, movement, and stability of his right shoulder because this Court has held in the Garrison case that an ALJ must select data points that of improvement. Mr. Rhoades also contends that the ALJ erred when he said that Dr. Verhoeghe, the surgeon, did not offer any further surgical solutions, whereas the records show that Dr. Verhoeghe discussed the possibility of having Mr. Rhoades undergo a hemiangioplasty of his right shoulder. And also, we contend that the ALJ erred because he did not indicate what weight he gave to Dr. Verhoeghe's opinion. And we also contend he did not set forth specific legitimate reasons to discredit Dr. Verhoeghe's opinion. Counsel, what you've said so far, you of course included in your brief, we reviewed that. I want to find out something a little different. In your reply brief at page 22, you explained why you couldn't get the additional medical evidence or MRI findings by the time of the four months after the ALJ hearing results. Well, first I'll just say that I was not the attorney to represent Mr. Rhoades here. I'll just say that there was a short time period involved here from the date of the remand order from the District Court to having the hearing decision and the appeals counsel decision. It's about a year's time here, but Mr. Rhoades was going to a tribal health clinic up in rural northern California outside of Redding. And the physician up there had to refer him back to Dr. Verhoeghe. Verhoeghe then had to get a prior authorization from the California Department of Health to have him undergo an MRI. This can take anywhere from six months to a year. Once that was done, then he sent him out to a second opinion. They got the test done, and then it was sent back to the physician. Where is any of this in the record? It's just the time period involved here. I set out the time period from the date of the remand order. Well, you're talking about that he needed prior authorization from the Cals. Where is that in the record? That is not in the record, Your Honor. This is just the way it operates. They will allow Medicaid, Medi-Cal, to pay for x-rays and CT scans, but MRIs require a prior authorization, which means that a medical necessity standard under California law. Let me stipulate, all that's true. In this case, at least based on my review of the record, I see that he did that, an MRI in 2008, in 2009, in 2012, in 2014. He clearly knew what to do and how to do it. But in this case, he has a determination. He doesn't act in the time that the appeals counsel has acted. And now he tells us that we should have that information before us. He can have a new proceeding. Of course, he can claim a new disability. But basically, I'm trying to understand why we should say, you know, this is an excusable delay when he clearly knows what to do and how to do it. You get an MRI. Well, the claimant knew that he had certainly serious problems with his shoulder. All I can say is he just went back to, there's voluminous records here that he had been treated for pain at the clinic part, for pain management here. And it seems like somewhere along the clinic, people would have referred him out to get another examination of his shoulder. Dr. Verhoegh, if they had sent it back to Dr. Verhoegh, then maybe he could have gotten authorization for it. The claimant just knows that he had three surgeries here, major injuries, and he just left it up to the clinics to try to take care of him. Again, I don't question your client's pain. What I'm trying to understand is, if I understand your request correctly, you want us to basically open up the hearing based upon an MRI that was done months after the appellate process was over within the administration. And in trying to understand is, what is the good cause? Well, there's two good causes. Did you put that before the district court? Was it in your motion? Did you make a motion to remand in the district court? No, we just submitted the medical evidence to the district court and said that it was dated after the ALJ's decision, so that's a good cause. And we did not make an allegation before the court that there was the extenuating circumstances, except to mention that he was going to a tribal health center out in the rural area. He's going to a clinic for pain management, and he's had a surgeon somewhere else here. Dr. Davis at the clinic here apparently didn't feel that anything could be done and had to send him out. He referred him back to Dr. Verhoegh to take care of it. It's just out of his hands. It just got handed from one person to another until it finally ended with Dr. Verhoegh, and Verhoegh said that he wanted a second opinion because they're talking about hemiplasty, maybe even total shoulder replacement, and so he got a second opinion. So it just went from one person to another, dragged out here. That was out of Mr. Why not just take that evidence and file a new claim? He could do that, but he's facing a res judicata problem, that the next judge would be bound by the last judge's findings. There are new findings after the fact, so it seems like his condition actually changed and deteriorated. He would have to allege a new onset date. He would have to forego any prior claims. He would have to allege a new onset date, inability to perform all work in the United States of America. That new onset date certainly would be the date of the new MRI findings that found that he's continued to have three tears in his tendons in his shoulder here, as well as the labrum. The labrum is a little piece of cartilage between the humerus and the He certainly could file a brand new application, allege a new onset date, and claim that his condition has worsened. Dr. Davis said that he was not able to perform sustained work activity. He was not able to lift more than three pounds, which is less than the definition of light work, and that he was not able to do sustained work activity. Yes, he could do all that and go all through it all over again here. He could go through the application process, go through the reconsideration, through the hearing date, a decision, appeals constitution. Up in the rural areas here, this takes like two years to get to the next judge. At the Eastern District of California, they have 4,000 cases backlogged there. The average time for us in the rural areas is one year from the request of a hearing to get a hearing scheduled here. I hear all that, but you're basically asking us to then ignore what the law says, that you have to prove that it's material and that you had a good cause, but you can't. It is material to his case. He's had three surgeries of that shoulder here, and every time they've done an MRI, they found that he continues to have a failed rotator cuffs surgery repair, and his condition definitely has gotten worse. The last one in 2016. It's different than what it was at the date of the disability hearing. One of the findings of the MRIs showed that his supraspinatus tendon here, each time, has full thickness tears. That was from the MRI that was done in 2008, 2009, 2014, and 2016. It is the same part of his body. Didn't the MRI in 2016 say it was a new tear? It was new from the last MRI? There was a new tear of the labrum. That was brand new, but the supraspinatus tendon has always been torn. It has never been properly repaired. I mean, there's no reason why he should give his claim. Is the evidence in the 2016 MRI, does that show anything about the condition of his arm at the time of the hearing? Is it material to that decision? It is material to the extent that, as I tried to point out here, that there's four tendons attached to the shoulder, and three of those tendons have always been tears, have tears in them, but what you can see through all of those MRIs here is that the one particular tendon that has never been properly repaired is the supraspinatus tendon, and that relates back to what Dr. Verhoek says is that he has always had failed rotator cuff surgeries. None of those surgeries have been effective. That tendon has always been torn for some reason here, and it continues to be torn in 2016 here. He had major pain in his arm because of these tendons that are torn here. That has never gone away. He's always had pain management here because it's excruciating pain here. Nothing has really changed because none of those surgeries have ever been effective, as Dr. Verhoek says. Well, things have changed. It actually got worse, right, in 2016? Don't you agree that his condition got worse in 2016? Well, I would say it's gotten worse because they said that there was an additional torn bicep tendon, and also they identified that the labrum, which was previously just deranged, now has tears in the cartilage. And this was all after April of 2016, correct? Well, it was detected for the first time in the MRI in 2016. That's correct. After the earlier hearing had occurred and the appeal had occurred. That's correct. That is something brand new. It's definitely gotten worse. It's a new injury. It's a new injury, but it still relates to the failed surgeries. Oh, it's the same part of the body, of course. Same part of the body. Yeah. And we contend that it would have a reasonable possibility of changing the outcome of the decision because Dr. Verhoek said that he had three failed rotator cuff surgeries and that Dr. Davis says that he was not able to perform sustained work activity. He couldn't lift more than three pounds. This rebuts the ALJ's finding that he had good recovery, mobility, stability, and function. He has never regained function of that arm here. This rebuts what the ALJ said. It hangs together. All right. Thank you, Cass. All right. I'd like to reserve a couple of minutes for rebuttal. Good morning, Your Honors. I'm Jennifer Kenney on behalf of the Commissioner for Social Security, Andrew Saul. The fundamental question before this court is whether the ALJ's interpretation of the evidence was reasonable and supported by substantial evidence. There's no dispute here that the claimant had residual symptoms after his surgeries, but not all pain and limitation equates to disability. Here, the ALJ reasonably found that the evidence showed he had sufficient recovery and was able to manage his residual symptoms with treatment, with medication, and occasional injections. The undisputed medical opinion evidence supports that. There are numerous doctors who found he could perform at least light work. That's consistent with the ALJ's finding at step five that he could perform unskilled light work requiring no more than occasional handling, fingering, and reaching. The treatment records also support the ALJ's finding. They show that the claimant's pain and depressive symptoms were well managed. The claimant told his providers that he was able to take care of his home and family. He was happy with his progress, and he was doing well. While it's evident to you, would you get to this consideration of the supplemental medical evidence issue? I think obviously that's where that has us concerned. Yes, so the evidence that was provided to the district court was new and related to a later period of time than what was at issue before the ALJ. And so, as has been recognized, the appropriate process here would be for the claimant to submit a new application and provide evidence of the changes that have occurred since the last decision, the last ALJ decision. Well, he argues that it's material to the condition as it existed at the time of the ALJ's decision. So certainly the x-ray indicates some of the same shoulder issues that he has been dealing with, but it also specifically says that one of the tears is new, and that it's new from the comparison x-ray. And as claimant's counsel has conceded, that is a new injury. And to the the appropriate next step would be to file a new claim and have that new injury adjudicated. Assuming it was material just for purposes of argument, how do you respond to the good cause argument? Say a good cause for submitting it after the fact. Uh, well, with respect to the opinion from Dr. Davis, that was a provider that he was in contact, that claimant was in contact with during the period at issue. And there's nothing in the record to suggest why he couldn't have received some sort of opinion from that doctor within the time frame that was at issue before the ALJ. So there doesn't appear to be any valid reason for waiting until October to get that opinion. So basically, you heard my questioning, counsel, about the MRI aspect of this. But it seems like he had had lots of MRIs, had lots of experience, and the doctors involved knew what he was going in for, because they were consulted. If this had been something they felt they needed to talk about, they could have done it, right? With or without the MRI. Yes, of course. And they didn't? That is correct. They just knew it occurred after the decision was made? Yes, that is correct. And in fact, he saw the physician assistant Herring twice, correct? Yes. Once in May and once in October of 2016, and it showed, according to Herring himself, that his condition deteriorated. Is that correct? In May, Dr. Herring said that he could do work. Yes. But by October, he said he could do no work. Correct. So something happened, something deteriorated in Mr. Rose's condition after the hearing. That would be a reasonable conclusion from that evidence, yes. Unless the panel has any further questions? Thank you, counsel. I would just like to point out to the court, I just thought of this here, that there is something additional. And that is, we believe that substantial evidence does not support the ALJ's finding that his pain symptoms were out of proportion to the medical evidence and that it was well controlled by medication. Because, as I noted, Mrs. Lind, a licensed clinical social worker, was treating him for depression. And we have contended that the ALJ erred in making his residual fungal capacity finding, because the ALJ did not discredit Mrs. Lind when she said that his pain caused such severe depression that it interfered with his ability to make judgments and make sound reasoning. So a part of the problem, I'm sure Mr. Rose was concerned about, is that after having discussions with Dr. Verhoegh, there was some discussion about total right shoulder replacement. And Dr. Verhoegh said he didn't want to do that because he's a young man still here. So he suggested hemiplasty. So there's been discussion about replacing his whole shoulder. He's in a lot of severe pain, under pain management, and apparently it affected his judgment and reasoning. And maybe he was reluctant to go ahead with major big-time searches. He's a young man. He's a working guy, a logger. And he may—I didn't talk to him, don't really know him, but he had made some bad decisions, reluctant to go ahead with major surgery. We contend this is another good cause reason. We'd all be hesitant about having our shoulders replaced. And I think that should be taken into consideration. ALJ did not include any limitation with regards to the combination of his pain symptoms plus depression in the residual function of passive finding, nor did he pose any such limitations in the hypothetical questions to the vocational expert. And we think that this should be considered. And whether he—I don't think there's any evidence that he voluntarily delayed or that he was malingering in any way, shape, or form here. He had numerous surgeries. There's been no improvement in his condition in that shoulder. It looks like it's getting worse where it's facing major decisions about how much damage he wanted to cause himself. Our presiding judge will decide in terms of timing, but you're over time. I just want to make clear I understand. Part of your case, you're arguing the decision of the ALJ. You're saying it was inadequate because the ALJ did not, you know, compare and contrast who said what and discount testimony and the like. And then you're talking secondly about this MRI, which occurred afterwards. We have really different issues here. But your argument about the pain that he's under—and we empathize with that—but the pain that he's under and what happened at the ALJ hearing is not what controls this. Is there good cause to open it up based upon this new evidence? You understand that, of course. Yes, I do, Your Honor. That's why I try to make connection that there's been permanent damage of the supraspinatus. Let's say that's all true. It's a new injury, and it wasn't available. That MRI was not available at the time that the ALJ made the decision. Yes, Your Honor, that's true. All right. Thank you, counsel. Rhodes v. Stahl will be submitted.
judges: Wardlaw, M. Smith, Bumatay